UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

IVERY MAYS, an individual,

Plaintiff,

v.

UNITED ASSOCIATION LOCAL 290
APPRENTICESHIP AND JOURNEYMEN
TRAINING TRUST FUND aka LOCAL 290
TRAINING CENTER, and CLARE
SHROPSHIRE, an individual

Defendants.

Case No. 3:16-cv-00914-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Ivery Mays ("Mays") brings this employment lawsuit against defendant United Association Local 290 Apprenticeship and Journeymen Training Trust Fund also referred to as Local 290 Training Center ("Training Center") and defendant Claire Shropshire ("Shropshire") (collectively referred to as "Defendants") arising from a prior employment relationship. Mays alleges claims of discrimination and retaliation in violation of 42 U.S.C. § 1981 and Oregon's Unlawful Employment Discrimination statute, ORS 659A.030; aiding and abetting in violation of ORS 659A.030(1)(g); and Intentional Interference with Economic Relations ("IIER") under Oregon common law. Defendants move for summary judgment on all claims. For the reasons stated below, Defendants' motion is denied as to Mays's claims of discrimination and retaliation. Defendants' motion is granted as to Mays's claims of aiding and abetting and IIER.

*Background*

I.     Mays's Employment History

Mays enrolled as a steamfitter apprentice, one of four classifications of apprentices, with the Training Center's apprenticeship program in 2011. (Def. Mot. Summ. J., ECF No. 89 ("Def. Mot.") at 3.)[1] The steamfitter apprenticeship "generally takes five years to complete, consisting of 10 terms of classroom training, and 8,000 training hours of actual work experience in the field with approved 'training agents' (union employers)." (Def. Mot., at 3.) Mays was an apprentice with the Training Center from June 2011 until his graduation from the program in 2017. (Decl. of David Sheridan, ECF No. 91 ("Sheridan Decl.") ¶ 8.) Mays worked from November 23, 2011, through June 3, 2014, for Harder Mechanical Contractors, Inc. ("Harder"), one of the Training

---

[1] For clarification, all record pinpoint cites in this opinion and order correspond to ECF page numbers not to the page number of the original document.

Center's largest union employers. (Compl., ECF No. 1 ("Compl.") ¶ 27; Decl. of Robert Meyer ("Meyer Decl."), ECF No. 101 Ex. 5 at 2; Am. Decl. of Allyson S. Krueger, ECF No. 93 ("Krueger Am. Decl.") Ex. 2 ("Mays Dep.") at 14.)

While working for Harder, Mays, the only African-American employee on site, worked at the Wafer-Tech site in Camas, Washington ("Wafer-Tech"). (Compl., ¶ 11; Decl. of Ivery Mays, ECF No. 100 ("Mays Decl.") Ex. 2 at 1.) In late January 2013, "Mays discovered a hangman's noose taped to inside of the door of the locker" while carrying out his normal duties of cleaning out certain lockers while at Wafer-Tech, and he subsequently forwarded photos of the noose to Harder management as part of his effort to report the incident. (Compl., ¶ 12; Mays Decl., Ex. 2 at 1.) Mays reported the incident to a Harder management employee, a foreman, and a site superintendent, but the site superintendent responded by stating that Mays was "blowing things out of proportion." (Compl., ¶ 14-15.) Mays also informed the general superintendent, Kevin Lucas ("Lucas"), who oversaw Wafer-Tech, of the noose incident. (Compl., ¶ 16.) Harder ultimately discovered that a Harder management employee, Grant Marboe ("Marboe"), made and taped the noose to the door of the locker. (Compl., ¶ 20; Meyer Decl., Ex. 4 ("Lucas Dep.") at 5, 9.) Following the discovery of Marboe's conduct, Mays was assigned to sites alongside Marboe despite Mays's voiced concerns about working with Marboe. (Compl., at ¶ 21-22; Mays Decl., ¶ 16.) Ultimately, Mays was transferred to a different location. (Mays Decl., ¶ 17.)

While employed at Harder, Mays filed complaints related to the noose incident with the Oregon Bureau of Labor and Industries ("BOLI"), Equal Employment Opportunity Commission ("EEOC"), the local Union, and the Washington Human Rights Commission. (Compl., ¶ 24; Mays Decl., Ex. 3, 4.) Mays also filed suit against Harder on May 26, 2015. (Compl., ¶ 31; Mays Decl., ¶ 22.) Although Mays heard from other Union employees that the lawsuit would strain the

relationship between Harder and the Training Center, Mays spoke with Shropshire on a phone call where she was angry at his decision of retaining counsel in relation to the Harder suit. (Krueger Decl., Ex. 2 at 19-20, 26.) As a result of stress and anxiety from working with Marboe after the noose incident, Mays took a medical leave of absence in early 2014. (Mays Decl., ¶ 19.) Two days after returning from his medical leave of absence, Harder fired Mays on June 3, 2014. (Mays Decl., ¶ 20; Meyer Decl., Ex. 4 at 6.) Mays was not aware of any difficulties with his eligibility to work at Harder until after he reported finding the noose. (Mays Decl., ¶ 18.)

Following his termination from Harder in June of 2014, Mays was never again dispatched to Harder. (Mays Decl., ¶ 21.) Rather, Mays was dispatched by the Training Center to the following contractors: Carr Electrical Tech, Inc. also referred to as QPS ("CETI/QPS") from July 10, 2014, through January 9, 2015, and November 11, 2015, through February 22, 2016; Temp Control Mechanical ("TCM") from March 21, 2016, through October 28, 2016; and Apollo Mechanical ("Apollo") from December 12, 2016, through the end of Mays' apprenticeship in 2017. (Mays Dep., at 14-15.) Mays claims he was denied work with Harder because Shropshire was not dispatching Mays in accordance with the general dispatch policy.[2] (Pl. Resp. to Def. Mot. for Summ. J., ECF No. 99 ("Pl. Resp.") at 12.) Although parties do not dispute the dispatch policy controls, they do dispute whether Shropshire dispatched Mays in accordance with the policy.

II.     Shropshire's Dispatching Process

From June 2013 through September 2016, Shropshire was the Director of Training for the Training Center, and she was responsible for overseeing the apprenticeship training program and dispatching apprentices to job assignments with union employers. (Def. Mot., at 4.) As part of

---

[2] Plaintiff raises the argument that Shropshire and Harder employees worked in concert to bar Mays from working with Harder. The court discusses this argument in the discussion portion of this opinion. *See infra* discussion section three – aiding and abetting claims.

the apprenticeship program, the Training Center dispatched apprentices to various union employers. (Def. Mot., at 3.) The purpose of the dispatching process was to "facilitat[e] the training of an [a]pprentice" by matching the apprentice with an appropriate union employer. (Decl. of Clare Shropshire, ECF No. 92 ("Shropshire Decl.") ¶ 7-8, Ex. 1.)

Shropshire described the general dispatch policy in the following manner: First, a union employer submitted a request for a certain number of apprentices within a geographic job location and with specified job criteria. (Def. Mot., at 4.) Union employers could specify whether any special skills or certifications were required for the position. (Def. Mot., at 4.) After the Training Center received a request from a union employer, Shropshire would consult a computer generated "out of work" or "Dispatch List" of apprentices who were seeking work. (Def. Mot., at 4-5.) The Dispatch List comprised apprentices who had been laid-off from a job and had returned to the Local 290 Union hiring hall to sign onto the Dispatch List. (Shropshire Decl., ¶ 14.) Local 290 created Dispatch List, but Shropshire still retained discretion to edit the Dispatch List. (Meyer Decl., Ex. 2 at 3-4; Shropshire Decl., ¶ 14; Meyer Decl., Ex. 3 at 5-6). The Dispatch List was dated when it was printed, not when it was generated from the computer program. (Meyer Decl., Ex. 3 at 5.) Prior to July 2014, Shropshire would notify the Union Hall of the apprentice to be dispatched to a job, and the apprentice would be dispatched from the Hall. (Meyer Decl., Ex. 3 at 6.) After July 2014, however, Shropshire had the responsibility to both select and dispatch the apprentice from the Training Center. (Meyer Decl., at 6, 11.)

Once an apprentice is on the Dispatch List, they would generally be dispatched on a "first in-first out basis." (Shropshire Decl., ¶ 17.) This meant that the apprentices who had been out of work the longest were at the top of the list and "would generally be put back to work first, assuming they were qualified for the position being filled." (Shropshire Decl., ¶ 18.) However, Shropshire's

secretary, Erin Macauley ("Macauley"), testified that an apprentice's number did not necessarily correspond to their position on the list. (Meyer Decl., Ex. 3 at 8.) Moreover, there were many reasons why the first apprentice on the Dispatch List would not be dispatched to the next available job. (Shropshire Decl., ¶ 20.) For example, if the apprentice at the top of the list did not have the right classification, or necessary certification, Shropshire would have to move to the next person on the list. (Shropshire Decl., ¶ 20.)

Geographic preferences also played a role in whether Shropshire followed the "first in-first out" rule. When an applicant applies to the apprenticeship training program, they indicate which "regions" or "zones" within Local 290's region they would be willing to work. (Shropshire Decl., ¶ 22; Shropshire Decl., Ex. 5.) Apprentices are also able to "designate additional zones at the time of each layoff." (Shropshire Decl., ¶ 22.) If a union employer requested apprentices for a job in a particular region, depending on the regions an apprentice selects, that could "result in an apprentice being dispatched ahead of a qualified apprentice higher on the out-of-work list who had not selected" that particular region. (Shropshire Decl., ¶ 23.)

Another factor Shropshire cites as an exception to the general policy is an apprentice's ability to pass a background check and obtain a security clearance. (Shropshire Decl., ¶ 25.) Some union employers require apprentices to pass a background check in order to receive a green badge. (Shropshire Decl., ¶ 25.) For example, "[u]nder Intel's policy, a worker could not pass a background check and receive a green badge if the worker had certain felony or misdemeanor convictions within the past 7 years." (Shropshire Decl., ¶ 25.) The term "green badge" was used synonymously with being able to pass a background check. (Shropshire Decl., ¶ 28.) More specifically, a "green badge" granted access to the most secured areas of the construction project, a privilege also referred to as "inside the fence." (Shropshire Decl., Decl., ¶ 29.) A "red badge,"

on the other hand, only granted access to the unsecured portion of the project site, a privilege also referred to as "outside the fence." (Shropshire Decl., ¶ 27.) "[A]ny union employer who was involved in a construction project 'inside the fence' at Intel was required to ensure that an apprentice . . . had passed a background check and was capable of obtaining a green badge so they could fully access the site." (Shropshire Decl., ¶ 29.) However, the responsibility of conducting these background checks was on the union employer. (Shropshire Decl., ¶ 29; Meyer Decl., Ex. 3 at 11.) Moreover, an adverse background check was not absolutely preclusive, e.g. "[a]ccess to Intel facilities is a privilege that may be granted at Intel's discretion upon request . . . ." (Shropshire Decl., Ex. 8.)

Shropshire had "a practice of indicating 'no green badge' or 'no Intel' on the out-of-work list under the 'comment' column [of the Dispatch List] if an apprentice was not able to pass a background check." (Shropshire Decl., ¶ 31.) Shropshire would take dispatch decisions that involved a deviation from the general policy to her supervisors. (Meyer Decl., Ex. 2 at 31-32.) For example, Shropshire consulted with supervisors whether a particular apprentice could retain his previous spot after being dispatched a week earlier because "it didn't seem right to put him all the way at the bottom of the list again." (Meyer Decl., Ex. 2 at 31.) However, Shropshire could exercise discretion to edit the list that would affect the dispatch process. (Meyer Decl., Ex. 2 at 16-17, 59.) Notably, Shropshire edited a note next to Mays's name that originally indicated "Intel Only" to "No Intel." (Meyer Decl., Ex. 2 at 15-16.) The former note appeared on a Dispatch List dated June 24, 2014, and an edit appeared on a Dispatch List dated June 25, 2014. (Meyer Decl., Ex. 2 at 36, 39.) Shropshire testified that she mis-wrote the former note regarding Mays. (Meyer Decl., Ex. 2 at 16.)

/ / / / / /

Mays was not dispatched to Harder, Macauley testified, because Jennifer Massey ("Massey"), a Harder employee, placed Mays on a "no call list." (Meyer Decl., Ex. 3 at 4.) Macauley also testified that Mays was not to be dispatched to Harder because "he had legal issues with [Harder]" and because "he couldn't qualify for their primary job site out at Intel." (Meyer Decl., Ex. 3 at 4.) After the noose incident at Harder, Shropshire said that Mays working for Harder would "never happen" "[b]ecause all the problems that he caused," and that he "was lucky to still even be an apprentice." (Meyer Decl., Ex. 3 at 4.) In approximately July or August of 2014, Shropshire said that Mays' "black ass would never work at Harder Mechanical again." (Decl. of Allyson S. Krueger in Support of Def. Mot. for Summ. J., ECF No. 93 ("Krueger Decl.") Ex. 4 at 8.)[3] Shropshire also used the term "black ass" in reference to the African-American members of the Training Center. (Krueger Decl., Ex. 4 at 9-10.) Specifically, Shropshire stated in the spring of 2015 that "[t]heir black asses can't keep up with the rest of the membership" referring to the African-American members's "workability," "ethic," and "whether or not they were qualified for the same types of jobs that their counterparts in the membership were" qualified to obtain. (Krueger Decl., Ex. 4 at 10.) Shropshire also used "black ass" to call her black dog into the house. (Meyer Decl., Ex. 3 at 10.) Shropshire expressed reservations about calling her black dog a "black ass" for fear that her neighbors would presume that she was "a racist living in their nice neighborhood because she would regularly yell that out into the neighborhood." (Meyer Decl., Ex. 3 at 10.)

/ / / / / /

/ / / / / /

---

[3] Shropshire generally denied using racial comments at the Training Center. (Meyer Decl., Ex. 2 at 13.)

III.    Harder dispatches during October 2015 and March 2016

Regarding any apprentice requests from Harder while Mays was on the Dispatch List, there are only two relevant time periods: October 2015 and March 2016. Dispatches during these time periods will be discussed in turn.

A.    October 9, 2015, Dispatch

On October 9, 2015, Shropshire received a telephone request "from Harder for an apprentice with a Ua41 tig weld certification." (Supp. Decl. of Clare Shropshire, ECF No. 112 ("Shropshire Supp. Decl.") ¶ 3; Meyer Decl., Ex. 2 at 40-44.) Shropshire determined that Jordan Alwert ("Alwert") was eligible to be dispatched ahead of other Region One apprentices, including Mays, because the request was specifically for an apprentice with a weld certification that Alwert had. (Shropshire Supp. Decl., ¶ 4-5.)   Another apprentice with a weld certification, Georgiy Kirchev ("Kirchev") was not dispatched because he was previously terminated for cause from Harder and "was not eligible to be re-dispatched to Harder at [that] time." (Shropshire Supp. Decl., ¶ 6.) There was no documentation that the request specified a weld certification specification. (Meyer Decl., Ex. 2 at 40-44.)[4]  Mays was the "seventh apprentice down on the list of Region [One] apprentices eligible for dispatch."  (Shropshire Supp. Decl., ¶ 7.)

B.    October 20, 2015, Dispatch

On October 20, 2015, Shropshire received a dispatch request from Harder for two apprentices to the Port Westward site; in response, Shropshire dispatched Nick Keser and Sean

---

[4] Defendants assert that Alwert being dispatched because of his weld certification was also corroborated by Macauley.  (Def. Reply at 27.) However, Macauley testified in response to being asked why Alwert was dispatched that she "[could] probably tell [Plaintiff's counsel] why." (Shropshire Supp. Decl., Ex. 5 at 3-4.) Further, Macauley testified that the weld certification was "likely why [Alwert] was the first one to go out even though he was 63. At that time, mostly only welders were going out to work." *Id.*

Burns. (Shropshire Supp. Decl., ¶¶ 9-10.) Although Shropshire originally treated the Port Westward site as Region Three, Shropshire testified that she made a mistake in making that determination and that Port Westward should have been treated as Region One for purposes of dispatching. (Shropshire Supp. Decl. ¶ 10; Meyer Decl., Ex. 2 at 48-50.) Had Port Westward been correctly treated as a Region One site, Justin Turner ("Turner") and Zachary Garrett ("Garrett") would have been dispatched. (Shropshire Supp. Decl., ¶ 12.) Tuner and Garrett were the first two available Region One apprentices and were ahead of Mays at the time of the October 20 request. (Shropshire Supp. Decl., ¶ 12.) Other apprentices listed ahead of Mays were not eligible to be dispatched because they were not available, as indicated by Shropshire's note of "TC" next to their names. (Shropshire Supp. Decl., ¶ 11.)

C.     October 22, 2015, Dispatch

On October 22, 2015, when Shropshire originally received a dispatch request from Harder for four apprentices to the Intel-Ronler Acres site, she began dispatching the next available apprentice, Turner. (Shropshire Supp. Decl., ¶ 14.) Lucas, a Harder managerial employee, however, changed the request from four to three apprentices documented in an email to Shropshire on October 22, 2015. (Meyer Decl., Ex. 9 at 9-10.) Shropshire dispatched Turner, which took Turner's name off the Dispatch List, prior to receiving the change from Lucas. (Shropshire Supp. Decl., ¶ 15.) To indicate Turner's position on the Dispatch List on the day she received the request, Shropshire handwrote Turner's name on the top of the October 23, 2015, Dispatch List along with his previous position on the list, fourth, and dating the handwritten addition as "10-22-15." (Meyer Decl., Ex. 2 at 59.)

The available apprentices and their positions on the October 23, 2015 Dispatch List were: Zachary Garrett ("Garrett"), tenth; Brick, eleventh; Lance Ziesing, ("Ziesing") twelfth; Steven Hooper ("Hooper") thirteenth; and Mays, fourteenth. (Meyer Decl., Ex. 2 at 54.) Ultimately,

Shropshire dispatched Turner, Ziesing, and Brick to Harder to the Intel-Ronler site. (Meyer Decl., Ex. 2 at 51-54, 67; Shropshire Supp. Decl., ¶ 16.)[5] By this time, Mays had already worked for CETI/QPS, who assigned Mays to a jobsite at Intel, and had received a green badge. (Mays Decl., ¶ 24; Meyer Decl., ¶ 24, Ex. 1 at 3-4.)

D.     October 29, 2015, Dispatch

Harder sent their next dispatch request to Shropshire on October 29, for one steamfitter apprentice to the Leupold & Stevens site. (Meyer Decl., Ex. 2 at 63.) However, unlike the other dispatch requests, the October 29 request specifically mentioned that the employee must be able to pass a background check. (Meyer Decl., Ex. 2 at 63.) In response, Shropshire dispatched Hooper, who was directly ahead of Mays. (Meyer Decl., Ex. 2 at 60, 64.) Mays still had "No Green Badge" next to his name on the dispatch list at the time of request on October 29. (Meyer Decl., Ex. 2 at 64.)

E.     Early March 2016 Dispatches[6]

Harder dispatch requests were received while Mays was on the Dispatch List during March 2016. (Meyer Decl., Ex. 10 at 10.) Shropshire dispatched eight apprentices to Harder between March 8 and March 14. (Meyer Decl., Ex. 10 at 1-8.) A dispatch request form dated March 14, 2016, requested three apprentices. (Meyer Decl., Ex. 10 at 9.) As of March 15, 2016, Mays was

---

[5] Originally, Shropshire dispatched Garrett, but replaced Garrett with Ziesing when she learned that Garrett could not pass a background check, as indicated by her handwritten note "No Green Badge" next to Garrett's name. (Shropshire Supp. Decl., ¶ 18; Meyer Decl., Ex. 2 at 21, 23, 59, 67.)

[6] The March 2016 dispatch records are discussed *infra* in the preliminary procedural matters. The court agrees with Defendants that the supporting evidence – various dispatch records – for the March 2016 dispatches are inadmissible. The court refers to these records only to provide context for other admissible evidence that is discussed below. Accordingly, the court does not take into account the inadmissible evidence relating to the March 2016 dispatches for purposes of this motion.

number seven on the Dispatch List. (Meyer Decl., Ex. 10 at 10.) At approximately 11:00 a.m. on March 15, 2016, Lucas emailed Shropshire asking, "Can we talk before you dispatch folks??" Later that same day, Lucas informed Shropshire by email that "[Harder had] no plans for bringing on any new apprentice" the following week. (Meyer Decl., Ex. 10 at 12.) Two days later, on March 17, 2016, Mays was dispatched to TCM. (Meyer Decl., Ex. 10 at 13.) At that time, Mays was listed as number four on the Dispatch List, and the "No Green Badge" is not reflected in his comment section on the dispatch list. (Meyer Decl., Ex. 10 at 14.) Mays had received a "green badge" on three other separate occasions: first, when he started working with CETI/QPS in approximately July of 2014; second, when he was dispatched back to CETI/QPS in November of 2015; and third, when he was dispatched to Apollo in December of 2016. (Meyer Decl., Ex. 1 at 3-4.) Mays testified that he told persons at the Training Center, including Shropshire, that he was able to pass a background check and receive a green badge. (Krueger Decl., Ex. 2 at 5.)[7]

F.     March 24, 2016, Dispatch

On March 24, 2016, in response to a March 24, 2016 dispatch request, Nicolas Martin ("Martin"), Kierchev, and Tyler Huck ("Huck") were dispatched to Harder. (Meyer Decl., Ex. 10 at 16-22.) Martin, in the number three position on the Dispatch List, was directly ahead of Mays on March 17, 2016, when Mays was dispatched to Temp Control Mechanical ("TCM"). (Meyer Decl., Ex. 10 at 14.)

As of March 21, 2016, Martin was third on the list, and Kierchev and Huck were seventh and eighth, respectively. (Meyer Decl., Ex. 10 at 24.) There were no typed or handwritten notes

---

[7] However, Mays was asked later in the deposition whether he told Shropshire that he could "Green Badge," and Mays answered that he could not recall. (Krueger Decl., Ex. 2 at 8-9.) Macauley testified that Mays directly said "No" when asked by Shropshire. (Meyer Decl., Ex. 3 at 4.)

to indicate the Region One apprentices ahead of Mays were unavailable. (Meyer Decl., Ex. 10 at 24.) After Mays's work with TCM ended, Mays was then dispatched to Apollo on December 12, 2016 where he worked until he graduated from the apprenticeship program. (Mays Dep., at 14-15.)

*Preliminary Procedural Matters*

Defendants object to several portions of the declarations and exhibits Mays offers in his Response to Defendants' Motion for Summary Judgment. Local Rules of Civil Procedure provide:

> Rather than filing a motion to strike, a party must assert any evidentiary objections in its response or reply memorandum. Evidentiary objections in a response or reply memorandum are subject to the certification requirement of LR 7-1(a) . . . . If an evidentiary objection is raised by the moving party in its reply memorandum, the non-moving party may file a surreply memorandum pursuant to this subparagraph within seven days addressing only the evidentiary objection; the moving party may not file further briefing on its evidentiary objection.

Local Rule 56-(1)(b). Each objection will be discussed in turn.

I.      Objections to Mays's Declaration

Defendants object to the admission of ¶¶ 23, 27, 28, and 30 of Mays's declaration, arguing they are inadmissible under Federal Rule of Evidence ("FRE") 602, which provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence used to establish personal knowledge may consist of a witness's own testimony." FED. R. EVID. 602.

*A.      Paragraph 23*

The evidence in ¶ 23 states the following:

> Green badges are required to work at some jobsites. Each jobsite has its own requirements to obtain a green badge. The jobsite is responsible for approving green badges, not the contractor. Intel requires workers to attend an orientation and pass a background check in order to obtain a green badge.

(Mays Decl., ¶ 23.)  Defendants argue this paragraph is inadmissible because Mays does not have personal knowledge of how green badges are approved.  FED. R. EVID. 602.  Plaintiff responds, without elaboration or specifying where in the record, that "[e]vidence used to establish[] personal knowledge may consist of a witness's own testimony."  FED. R. EVID. 602.  For the following reasons, Defendants' objection to ¶ 23 is sustained in part and overruled in part.

Supporting testimony was offered in Mays's deposition.  (Mays Dep., at 2-4.)  In his deposition, Mays testified to obtaining a "green badge" at Intel, which required passing a background check.  This is direct support of the first and third sentences in the paragraph. Accordingly, the first and third sentences are admissible, and Defendants' objection is overruled to this extent.

The second sentence – "jobsite is responsible for approving green badges, not the contractor" – is not supported by personal knowledge.  Mays's statement also could not be admissible as opinion of the witness.  *See United States v. Abel*, 469 U.S. 45, 56, 105 S. Ct. 465 (1984) (stating that "there is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case."); FED. R. EVID. 701.[8]

Mays testified that he applied for a "green badge" at an Intel jobsite and that he received a determination regarding a "green badge" within hours.  (Mays Dep., at 4-5.)  Mays's statement that jobsites in general are responsible for the background check is not rationally based on his perception, because he submitted his information for a green badge only at the Intel site or to

---

[8] FRE 701 provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

employers that sent him to Intel. His statement that he acquired a green badge for work at the Intel worksite does not support his assertion that jobsites in general are responsible for administering background checks. Accordingly, Defendants' objection is sustained with respect to the second line of ¶ 23.

### B. Paragraph 27

The evidence in ¶ 27 states the following:

> At the orientation, I completed and submitted to intel a document called "Your World Wide ID Form." During the orientation, Intel used the form to run a background check on me. At the end of the orientation, approximately four hours after it began, the background check was approved and I received a green badge from Intel. Attached as Exhibit 7 is the green badge I obtained.

(Mays Decl., ¶ 27.) Defendants again argue that this paragraph should not be admissible under FRE 602 for lack of personal knowledge. The court disagrees. (Mays Dep., at 3-5.) In his deposition, Plaintiff testified to his personal experience with the procedures of obtaining a badge with Intel. *Id.* Accordingly, Defendants' objection to ¶ 27 is overruled.

### C. Paragraph 28

Defendants object to ¶ 28 under FRE 602 for lack of personal knowledge. In ¶ 28, Mays states, "[c]ertain felony convictions will disqualify a person from getting green badge approval at Intel, such as a domestic violence conviction. I have a drug conviction for marijuana, but it did not impede my ability to obtain a green badge from Intel." (Mays Decl., ¶ 28.) Plaintiff has not provided testimony that supports a finding that the proffered testimony is based on his personal knowledge. Accordingly, Defendants' objection is sustained.

### D. Paragraph 30

Defendants also objects to ¶ 30 arguing that Plaintiff lacks personal knowledge of the proffered evidence. The evidence in ¶ 30 states:

> I consider Harder is one of the top contractors who hire through the Training Center as they are the biggest and get the most work. I believe I was terminated by Harder and not dispatched by the Training Center to Harder due to my complaint about the noose I discovered while working for them. Not being able to work for them has impacted my confidence and reduced the opportunities I had in the apprenticeship program.

(Mays Decl., ¶ 30.) Although Defendants do not offer further explanation of their objection, the court determines that the second line is the only portion to which an objection based on lack of personal knowledge may apply. Because the second sentence in ¶ 30 lacks proper foundation and does not constitute lay witness opinion testimony, it is not admissible.

Testimony from a plaintiff regarding the basis of a discrimination suit cannot be based on inadmissible hearsay. *Leon v. Saldana*, 675 F. App'x 694, 695 (9th Cir. 2017) (holding that the plaintiff's testimony that he believed that his replacement was "under thirty but under forty for certain, with lesser seniority" was not lay witness testimony because it was based on inadmissible hearsay from co-workers informing plaintiff that his replacement was younger). Mays learned from co-workers that his lawsuit could strain relations between Harder and the Training Center. Although Mays did have a conversation with Shropshire that suggested that his lawsuit was not well received by the Training Center, the phone call is not sufficient evidence to constitute personal knowledge of the decision-making process after Mays filed his lawsuit. Furthermore, Mays did not perceive any event that would support the statement as lay witness opinion testimony. The only remaining evidentiary support for this statement is based on hearsay from co-workers. Accordingly, Defendants' objection is sustained.

## II.     Motion to Strike Meyer's Declaration

Next, Defendants object to several paragraphs and exhibits offered in the declaration of Mays's counsel, Robert Meyer.

/ / / / / /

Defendants object to Exhibit 4 of Robert Meyer's Declaration, which is a deposition excerpt of Kevin Lucas, a Harder managerial employee, and an accompanying exhibit. (Meyer Decl., Lucas Dep. at 5.) The excerpt is from a deposition taken in the *Mays v. Harder Mechanical* case, and describes a conversation between Lucas and Marboe. Specifically, Defendants object to page 80, lines 2–10 of the deposition excerpt and the accompanying email exhibit. The excerpt reads:

> Q: I'm going to hand you what's been marked as Exhibit 18. That is an email string between you and Mr. Murphy.
>
> A: Yes.
>
> Q: Okay. And you indicated to Mr. Murphy that you asked Mr. Marboe if he understood the racial overtone of hanging up a noose with a black apprentice on the job. Is that correct?
>
> A: That's correct.

(Lucas Dep., at 5.)

> Lucas email to Bill Murphey (Harder Risk Manager): "I sat down with Grant Marboe and ask (sic) him about the noose hanging from the tools box and ask (sic) him if he tied it. He admitted to tying the knot and explained how the situation occurred. I asked him if he understood the racial overtone of hanging up the noose with a black apprentice on the job and he responded saying he never even considered it. He said that he was sorry and would apologize to the apprentice if we wanted him to. I told him that I was going to give him a warning and it would be going in his file. I would like you to review the warning letter once its (sic) completed. Comments.

(Lucas Dep., Ex. 18.)

Defendants argue that because Harder produced only a redacted version of Lucas's deposition in response to a subpoena and Plaintiff did not produce the unredacted copy and accompanying email, the evidence should not be admissible pursuant to Federal Rule of Civil Procedure ("FRCP") 37(c)(1). In response, Mays argues that they did not fail to disclose because

the redacted documents were received via Defendant's subpoena to a non-party (Harder). Plaintiff further argues that because the documents were received via Defendants' subpoena to Harder, Defendants are responsible for not receiving the unredacted version by failing to follow-up on its own subpoena or through other means of discovery.

Defendants cite FRCP 37(c)(1), which provides, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Whether or not Defendants are able to seek refuge under FRCP 37(c)(1) depends on whether Mays was required to disclose information under FRCP 26(a) or (e).

FRCP 26(a) provides that,

a party must, without awaiting a discovery request, provide to the other parties:

(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment; (ii) a copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment . . . .

FED. R. CIV. P. 26(a)(1)(A)(i)-(ii).

FRCP 26(e) provides that

[a] party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court.

FED. R. CIV. P. 26(e).

FRCP 26(a)(1)(A)(i) does not require disclosure of documents related to the identification of witnesses and their related subject matter. The objected to materials may have been a required disclosure under FRCP 26(a)(1)(A)(ii), but these materials fall squarely within the materials exempted under FRCP 26(a)(1)(B)(viii), which provides that "a proceeding ancillary to a proceeding in another court" is exempt from initial disclosure. The deposition and accompanying exhibit are both part of a "proceeding ancillary to a proceeding in another court" as they both are part of a deposition related to the *Harder* case.

Because Mays is exempt from providing the documents as initial disclosures under FRCP 26(a)(1)(B)(viii), Mays would be required to supplement incomplete materials only if Plaintiff "responded to an interrogatory [or] request for production[.]" FED. R. CIV. P. 26(e). However, in the only request for production in the record, Defendants requested the production only of the settlement agreement between Harder and Mays and any other documents that resulted to the resolution of the case. (Defs.' Mot. to Compel Produc. of Docs., ECF No. 22 ("Defs.' Mot. to Compel") Ex. 6 at 6.) Defendants' motion to compel was granted on May 1, 2017. (Min. of Proceedings, ECF No. 41)

Ostensibly, the subject materials are not related to the resolution of the case. Plaintiff did not disclose them pursuant to a request for production, and because they were not related to the request for production, Plaintiff was not required to provide supplemental disclosures under FRCP 26(e). Although Mays included reference to Lucas in a supplemental disclosure, the disclosure is exempt from FRCP 26(a) and was not in response to an interrogatory or request for production. (Shropshire Supp. Decl., Ex. 2 at 7-8.) Therefore, because Mays was not required to make a disclosure under either FRCP 26(a) or (e), Defendants' objection is overruled.

/ / / / / /

B.     *Exhibits 8-10*

Defendants object to Exhibits 8, 9, and 10 of the Meyers Declaration, which contain dispatch records from the Training Center that are related to various job sites and employees, arguing that these records are inadmissible because Mays's counsel does not have personal knowledge to interpret the dispatch records.  Defendants rely on FRCP 56(c)(4) and *Beyah v. Coughlin,* 789 F.2d 986, 989-90 (2nd Cir. 1986) (citing predecessor to FRCP 56(c)(4), FRCP 56(e), and holding that letters from non-party individuals attached to an attorney's affidavit did not satisfy the personal knowledge requirement of FRCP 56(e)).  In response, Mays argues that his counsel is merely identifying and describing the records, not interpreting them.  For the reasons stated below, Defendants' objection is sustained in part and overruled in part.

FRCP 56(c)(4) provides that a "declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters."  Because the court may consider only admissible evidence at the summary judgment stage, the court necessarily looks to whether the evidence has been authenticated, as authentication is a condition precedent to admissibility.  *Orr v. Bank of Am., NT & SA,* 285 F.3d 764, 773-74 (9th Cir. 2002).  However, in the context of a summary judgment motion, attached documents requiring personal knowledge can also be authenticated under FRE 901 or 902.  *Id.* at 774.

The exception under which exhibits fall is found in FRE 902(11), which requires that a document satisfy the requirements of FRE 803(6)(A)-(C) and is accompanied by a "certification of the custodian or another qualified person."  FED. R. EVID. 902(11).  FRE 803(6)(A)-(C) provides that the "(A) record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity

of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity[.]"

Furthermore, not only does "a witness not have to be the custodian of documents offered into evidence to establish Rule 803(6)'s foundational requirements," the "phrase 'other qualified witness' is broadly interpreted to require only that the witness understand the record-keeping system." *United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993) (citing *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir.1991)). When evidence is produced pursuant to a subpoena, the "response to a subpoena duces tecum is itself a representation that the documents produced are those demanded by the subpoena." *Curcio v. United States*, 354 U.S. 118, 125, 77 S. Ct. 1145 (1957).

Included in Plaintiff's exhibits is a letter dated August 2, 2017 ("subpoena response"), from Harder's lawyer, Liani J. Reeves, in which she states the following: "[a] report that includes all apprentices that worked at Harder between May 1, 2014 and July 16, 2017 . . ." and "results of a search for all emails from January 1, 2013, to present that are to or from Harder employees Kevin Lucas, Jen Massey and Sharon Boland and any @290.org email address . . . ." (Meyer Decl., Ex. 10 at 26-27.) The evidence in these exhibits is authenticated for purposes of FRE 902(11) to the extent that it was produced in the subpoena response to Plaintiff, and is admissible.

Evidence that was not produced by counsel in the August 2, 2017, response letter, however, is not admissible, because if it is unrelated to Harder business records or communications, then it is presumably not authenticated and thus, not admissible. Accordingly, Defendants' objection is overruled only to the extent that evidence was produced in the subpoena response. Defendants' objection is otherwise sustained because Mays has not shown the non-Harder documents satisfy

FRE 803(6)(A)-(C) or provided certification for documents other than those related to the subpoena response.[9]

C. *Email String*

Lastly, Defendants object to the email string between Shropshire and Massy, a Harder employee, wherein Massey relayed to Shropshire a post on a Local 290 Facebook group from Amy Sprengelmeyer ("Sprengelmeyer"). In the forwarded post, Sprengelmeyer indicates that she was an apprentice at the Training Center and alleges that Shropshire regularly operated outside of the general dispatching policy. (Meyer Decl., Ex. 13 ("Email String") at 1-5). Sprengelmeyer further indicated that Shropshire would punish apprentices outside of the normal process by "withholding work from them . . . ." (Email String, at 3). Defendants argue that the Email String is inadmissible hearsay per FRE 801 and 802 and does not possess the indicia of a business record under FRE 803(6). Plaintiff's response, unsupported by authority, is that the email does possess indicia of a business record because the Email String contains Shropshire's work email address. As explained below, the Email String is not admissible. Accordingly, Defendants objection is sustained.

That a work email address is connected to a particular conversation does not transform the otherwise non-business content into a business record. *See Monotype Corp. v. Int'l Typeface Corp.*, 43 F.3d 443, 450 (9th Cir. 1994) (holding that emails are not automatically admissible under the business records exception because e-mail is less of "systematic business activity than computer-generated business records"). Although courts in this circuit have moved away from a stringent view that emails are not business records, this court has applied the *Deepwater Horizon*

---

[9] Part of the dispatch records that are inadmissible relate to both the October 2015 and March 2016 dispatches. Defendant provided dispatch records related to October 2015. However, because part of the March 2016 dispatch records were only provided by Plaintiff and are inadmissible, the court will not consider Plaintiff's argument relating to March 2016 as those inadmissible records substantively underscore the argument.

framework to determine whether emails are admissible as a business record. *Rogers v. Oregon Trail Elec. Consumers Coop.*, Inc., No. 3:10-CV-1337-AC, 2012 WL 1635127, at *10 (D. Or. May 8, 2012). *See also Ionian Corp. v. Country Mut. Ins. Co.*, No. 3:10–cv–0199–ST, 2011 WL 6070442, at *2, *18 (D. Or. Dec. 2, 2011) (admitting emails as business records); *Age Grp. Ltd. v. Regal W. Corp.*, No. C07-1303BHS, 2008 WL 4934039, at *2-3 (W. D. Wash. Nov. 14, 2008) (excluding email evidence, but only because the proponent failed to lay the foundation to qualify the emails as business records).

Under the *Deepwater Horizon* framework, an email is an admissible business record only if: (1) it was sent or received contemporaneously with the event(s) described in the email; (2) it was sent by someone with knowledge of the event(s) documented in the email; (3) it was sent or received in the course of a regular business activity; (4) it is "the producing defendant's regular practice to send or receive emails that record the type of event(s) documented in the email[;]" and (5) a custodian or qualified witness attests that these conditions have been fulfilled. *Rogers*, 2012 WL 1635127, at *9.

Plaintiff offers no evidence or explanation to demonstrate how the Email String meets the *Deepwater Horizon* test or any other standard that might apply, and, in fact, the Email String contains none of the indicia necessary to meet that test. The email, standing alone, does not demonstrate that Massey had knowledge of Sprengelmeyer's allegations documented in the forwarded post. At most, the Email String suggests that Massey saw the post and forwarded the post to Shropshire without further inquiry by Massey. Moreover, Plaintiff has failed to offer evidence to support a finding that the email was received by Shropshire as a regular business activity. The correspondence between Shropshire and Harder employees dealt with general dispatching processes and conveying apprentice records, not allegations of discriminatory or

retaliatory conduct. Lastly, Plaintiff has not provided evidence whether it was Defendants' regular practice to transmit emails documenting allegations of unlawful conduct. Defendants' correspondence in the record does not support a finding that Defendants had a regular practice of documenting allegations of unlawful conduct. Accordingly, this Email String is not admissible as a business record.

*Legal Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (a). The moving party has the initial burden of proof of informing the court of the basis of its motion and "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (internal quotations omitted). If the moving party shows that there is no genuine dispute of material fact, then the nonmoving party must go outside of the pleadings to point to facts that establish a genuine issue for trial. *Id.* at 324. Accordingly, summary judgment should be entered against a party only when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

"[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The court views the evidence and inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Moreover, all reasonable doubt as to the existence of a genuine issue must be resolved in favor of the nonmoving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). "Summary judgment is disfavored in employment

discrimination cases because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder upon a full record." *Rogers*, 2012 WL 1635127, at *6 (internal quote omitted) (citation omitted). However, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]" *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita,* 475 U.S. 587 (internal quotations omitted).

*Discussion*

I.      Race Discrimination

Defendants first seek summary judgment on Mays's race discrimination claims filed under 42 U.S.C. § 1981 and ORS 659A.030. The analysis applied to race discrimination claims under 42 U.S.C. § 1981 is also applied to claims brought under ORS 659A.030. *Davis v. Tri-Cty. Metro. Transp. Dist. of Oregon*, 45 F. Supp. 3d 1222, 1250 (D. Or. 2014). Moreover, the analysis under Title VII claims is applied to both 42 U.S.C. § 1981 and ORS 659A.030 claims. *Campbell v. Knife River Corp.-Nw.*, 783 F. Supp. 2d 1137, 1147 (D. Or. 2011). Accordingly, Mays's state and federal discrimination claims will be analyzed together.

A.      *Prima Facia Case of Race Discrimination*

A plaintiff can demonstrate that he was subject to disparate treatment by establishing a *prima facia* case of discrimination under the three-step *McDonnell-Douglas* burden-shifting framework, or alternatively, may present "direct or circumstantial evidence that a discriminatory reason more likely than not motivated the defendant." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 696-97 (9th Cir. 2017) (citation omitted).

The plaintiff bears the initial burden of establishing a prima *facie case* of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "To establish a *prima facie* case,

a plaintiff must offer evidence that give[s] rise to an inference of unlawful discrimination." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998), *as amended* (Aug. 11, 1998) (citation omitted) (alteration in original*)*. To establish a *prima facia* case under *McDonnell-Douglas*, a plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably . . . ." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) (citations omitted).

However, the degree of proof necessary to establish a *prima facie* case is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005) (citations omitted). If plaintiff establishes a *prima facie* case, the burden of production then shifts to defendant to "articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010) (internal quotations omitted) (citation omitted). If the employer carries their burden at this stage, then the presumption of unlawful discrimination "simply drops out of the picture." *Dominguez-Curry*, 424 F.3d at 1037 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). The burden then shifts back to the plaintiff to "raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination." *Id.* (citation omitted). The plaintiff's burden is met at this stage either by showing that unlawful discrimination more than likely motivated the employer, or by demonstrating that the employer's proffered explanation is "unworthy of credence because it is inconsistent or otherwise not believable." *Id.* (citing *Godwin*,150 F.3d at 1220-22).

Defendant concedes Plaintiff is a member of a protected class, but argues that he has failed to establish a genuine dispute of material fact as to the remaining three elements of his *prima facia*

case: whether he was qualified for the position, whether he was subjected to an adverse employment decision, and whether similarly situated individuals were treated more favorably. (Def. Mot. for Summ. J., at 27.) Although Plaintiff responds that direct evidence establishes a *prima facia* case and pretext (Pl. Resp., at 26-29), the "*McDonnell-Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination," *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (citations omitted). Moreover, as Ninth Circuit noted, the *McDonnell-Douglas* framework is not an exclusive means of proving disparate treatment. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir. 2002), *aff'd*, 539 U.S. 90, 123 S. Ct. 2148 (2003). Accordingly, the first question is whether Plaintiff offered evidence such that there is a genuine dispute that a discriminatory reason more likely than not motivated Shropshire.

> B.    *Direct Evidence*

"Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin*, 150 F.3d at 1221 (citation omitted) (alteration in original) (internal quotations omitted). Direct evidence typically consists of "clearly sexist, racist, or similarly discriminatory statements [] by the employer. " *Coghlan*, 413 F.3d at 1094-95 (citation omitted). Evidence of racist statements that are not directed toward a plaintiff can still be deemed direct evidence of discriminatory animus. *See id.* at 1095 n.6 (stating that "when evidence establishes the employer's animus toward the class to which plaintiff belongs, the inference to the fact of discrimination against the plaintiff is sufficiently small that we have treated the evidence as direct").

If a plaintiff proves their case by offering direct evidence of discriminatory animus, then they have necessarily created a "triable issue as to the actual motivation of the employer[] even if it is not substantial." *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003), *as amended* (Jan. 6, 2004); *see also Shelley v. Geren,* 666 F.3d 599, 615 (9th Cir. 2012) (stating that

because the *McDonnell-Douglas* framework is not a strict requirement, a plaintiff can "produce more probative evidence of discrimination . . . ."); *see also Coghlan*, 413 F.3d at 1095 (stating that "[b]ecause direct evidence is so probative, the plaintiff need offer "very little" direct evidence to raise a genuine issue of material fact") (citing *Godwin,* 150 F.3d at 1221). Furthermore, when discriminatory statements are uttered by a "decisionmaker" "against a member of plaintiff's class, a reasonable factfinder may conclude that discriminatory animus played a role in the challenged decision." *Dominguez-Curry,* 424 F.3d at 1038.

Here, Plaintiff offers the following as direct evidence: (1) that Shropshire stated in July or August of 2014 that Mays's "black ass would never work at Harder again;" (2) that Shropshire stated in 2015 that "[t]heir black asses [referring generally to the workforce consisting of African-American employees] can't keep up with the rest of the membership;" (3) that Shropshire made racially insensitive remarks about Mays approximately ten-to-fifteen times; and (4) that Shropshire was concerned her neighbors would believe that she was racist for her use of "black ass" when calling for her black dog, (Meyer Decl., Ex. 3 at 9, 10, 13; Pl. Resp., at 27-28.)

Defendant argues that Plaintiff's evidence falls under the stray remarks doctrine and does not constitute direct evidence because the statements: (1) require substantial inference in order to find discriminatory animus; (2) are unrelated to the decision-making process; and (3) are temporally too remote from any challenged employment decisions. (Def. Reply, at 34, 36.) Although Defendants correctly state the standard for what constitutes a stray remark, the remarks made in this case do not fall within the ambit of the "stray remarks" doctrine for three reasons. First, there is less of an inferential step required to consider evidence as direct when discriminatory statements involve race. Second, the nature of Shropshire's position makes her statements sufficiently related to the decisional process. Third, whether a particular statement was temporally

remote to a decisional process does not preclude a finding of direct evidence when the statement is clearly discriminatory and the decision-maker also made the statement.

Racially discriminatory remarks require less of an inferential step to find discriminatory animus than statements involving age or gender. *Compare Coghlan*, 413 F.3d at 1095 n.6 (finding that when employer's animus is directed against a whole class to which plaintiff is a class member, the "inferential step is sufficiently small so as to consider that evidence as direct"); *with Peters v. Shamrock Foods Co.*, 262 F. App'x 30, 32 (9th Cir. 2007) (reasoning that the invocation of "mom" did not constitute direct evidence of gender discrimination because the ambiguous meaning of the term required an inferential step to arrive at gender discrimination); *and Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (holding that the statements "[w]e don't necessarily like grey hair" and "[w]e don't want unpromotable fifty-year olds around" were, although arguably discriminatory, stray remarks). This is because the invocation of racial epithets are unambiguous with respect to the speaker's discriminatory animus toward the targeted class. *See Cordova v. State Farm Ins. Companies,* 124 F.3d 1145, 1149 (9th Cir. 1997) (holding that the manager's use of "dumb Mexican" in reference to a Hispanic employee was sufficient to create an inference of discriminatory animus); *see also Chuang v. Univ. of California Davis, Bd. of Tr.*, 225 F.3d 1115, 1128 (9th Cir. 2000) (holding that the use of the term "chinks" in reference to Asian-American employees constituted direct evidence of discrimination); *see also Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 (11th Cir. 1982) (finding that the phrase "black ass" is a racial epithet). Moreover, bigoted comments regarding not only the plaintiff's class, but also class members who are plaintiff's co-workers, strengthens the probative value of discriminatory intent. *See Chuang*, 225 F.3d at 1128 n.13.

/ / / / / /

Here, not only was Shropshire clearly aware that her invocation of the term "black ass" could be interpreted by her neighbors as her being "a racist," she also used the racial epithet, despite her reservations, in reference to both Mays and Mays's other African-American co-workers. Although a fact finder could conclude that the statement specifically about Mays was descriptive of the situation – that Mays would not work for Harder during pending litigation – Shropshire's statement about African-American employees in general allows an equally plausible alternative inference of discriminatory animus. The latter statement could be understood to imply a sense of inferiority of the class to which Mays belongs. Additionally, Shropshire's awareness of the term's connotation, as demonstrated by her testimony concerning her dog and by her derogatory remark to the general class of African-Americans, decreases the inferential step the factfinder would have to make to find discriminatory animus by Shropshire. Viewing the evidence in the light most favorable to Mays, a factfinder would need only make an "inferential step [that] is sufficiently small so as to consider that evidence as direct."[10]

The court disagrees with Defendants that Shropshire's statements are stray remarks. Defendants are correct that the Ninth Circuit has held that discriminatory statements, in general, are stray remarks when they are uttered in an ambivalent manner and are unrelated to the decisional process. *Nesbit*, 994 F.2d at 705 (finding comments "stray" when "uttered in an ambivalent manner and . . . not tied directly to [plaintiff's] termination"); *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir.1990) (defining "stray" remarks as arguably discriminatory yet "unrelated to the decisional process"). Additionally, racially discriminatory statements are "stray"

---

[10] This is notwithstanding Shropshire's explicit denial that she made the statement about Mays. (Shropshire Decl., ¶ 64.)

insofar as they are made by co-workers with no influence on any decisions impacting plaintiff. *Patterson v. Apple Comput., Inc.*, 256 F. App'x 165, 168 (9th Cir. 2007).

However, racially discriminatory statements made by "senior decision-makers" in a "position of authority with respect to [plaintiff's] employment" do not constitute stray remarks. *Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169, 1180 (9th Cir. 1998) (finding that "[e]vidence of ethnically biased remarks from a person in such a position of authority are sufficient to allege the connection necessary . . . to survive summary judgment"). Moreover, although discriminatory statements can be made in an ambivalent manner, racially discriminatory statements can be sufficiently egregious such that they are not considered ambivalent. *Compare Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918-19 (9th Cir. 1996) (holding that a supervisor's comment that he intended to get rid of all the "old timers" was ambiguous and could not support an inference of age discrimination); *with Adams v. Home Depot USA, Inc.*, No. 05-CV-1798 ST, 2007 WL 4565163, at *18 (D. Or. Dec. 19, 2007) (holding that a supervisor's comments – "Are you monkeys done yet?" and "[plaintiff] should go home and eat some bananas" – to African-American employees were not ambivalent).

When a racially discriminatory statement is egregious, the stray remarks analysis turns only on the statements' relatedness to the decisional process. *Compare Patterson*, 256 F. App'x at 168 (holding that racial statements, although made in poor taste, were stray remarks because they "had absolutely nothing to do with workplace decision making"); *with Harris v. Itzhaki*, 183 F.3d 1043, 1055 (9th Cir. 1999) (finding that an employee's statement – that the owner did not want to rent to blacks – was sufficiently connected to the decisional process to be direct evidence); *and Magsanoc v. Coast Hotels & Casinos, Inc.*, 293 F. App'x 454, 455 (9th Cir. 2008) (finding that a co-worker's explicitly racist comments were not tied directly to the termination decisions and were

stray remarks). Consequently, the invocation of a racial slur, rather than a passing comment on race, cannot be considered ambivalent. *Chuang*, 225 F.3d at 1128 (holding that the statement "two Chinks" in reference to Asian-American doctors constituted direct evidence). A racial slur is not a statement that leaves a listener unsure as to the speaker's viewpoint regarding a group of people. *See id.* On the contrary, it informs the listener of the coarseness with which the speaker is willing to belittle a person based on an immutable trait. *See id.* Defendants cite various cases in support of their argument that Shropshire's racial remarks should be considered stray remarks, but those cases are distinguishable and not binding.[11] Additionally, Defendants have not cited, nor has the court found, a case where an egregious racial remark was deemed to have been made in an ambivalent manner.

Moreover, racially discriminatory statements regarding a person's race, or a particular race in general, are not unrelated to the decisional process when they are made by a decisionmaker. *Dominguez-Curry*, 424 F.3d at 1038. Although there must be a "nexus" between a racial slur and the challenged decision, the nexus is met when the speaker is in a position of authority to the plaintiff. *See DeHorney v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 879 F.2d 459, 468 (9th Cir. 1989) (stating that a nexus between a racial slur and a challenged decision is required); *see also Mangold v. Cal. Pub. Util. Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995) (finding that discriminatory statements by "senior decision-makers" during the course of plaintiff's employment created a "strong inference of intentional discrimination" and were not stray remarks); *see also See Mustafa*, 157 F.3d at 1180 (9th Cir. 1998) (reasoning that the speaker's position of authority over plaintiff was the reason why the racial remarks were sufficiently related to the decisional process to not

---

[11] The cases cited by Defendants in which the court found discriminatory remarks too temporally remote from the decisional process, are all from circuits other than the Ninth Circuit.

constitute a stray remark). Additionally, a racial slur made by a decisionmaker need not be causally connected to the challenged action to be considered related to the decisional process. *See Mustafa*, 157 F.3d at 1180 (9th Cir. 1998). "If discriminatory intent plays any role in a defendant's [employment decision related to] plaintiff, even if it is merely one factor and not the sole cause of the decision, then that plaintiff has [established a disparate treatment case under § 1981]." *Nat'l Ass'n of African Am.-Owned Media v. Charter Commc'ns, Inc.*, 915 F.3d 617, 626 (9th Cir. 2019) (holding that a mixed-motives claim is cognizable under 42 U.S.C. § 1981 and that a mixed motives defense does not relieve a defendant from liability). Therefore, if a reasonable fact finder could conclude that an employment decision was motivated at least in part by an illegitimate reason, then summary judgment is not appropriate. *Dominguez-Curry*, 424 F.3d at 1041.

Here, Defendants challenge the relatedness of the statements to the challenged decisional process of dispatching apprentices. Although the list was created at the Union hall, Shropshire's position puts her in control of which apprentices ultimately are sent to which work sites. Defendants argue that Shropshire applied the Dispatch Policy equally to all apprentices and that there were safeguards that prevented abuse of discretion, such as requiring permission from supervisors to deviate from the Dispatch Policy.

Plaintiff has offered evidence, however, demonstrating that Shropshire exercised discretion to deviate from the list for various reasons and on more than one occasion. A reasonable factfinder could conclude that Shropshire deviated from the Dispatch Policy without permission when Shropshire treated the October 20, 2015, dispatch to Port Westward as a Region Three worksite as opposed to the correct designation of Region One.[12] There is no evidence in the record that suggests Shropshire cleared this decision with other employees or supervisors. Moreover, both

---

[12] The October 2015 dispatches are discussed further *infra*.

the change in notation with respect to Mays's ability to work at Intel and Shropshire's ability to edit the Dispatch List would allow a reasonable factfinder to conclude that Shropshire was not strictly required to report most deviations from the Dispatch Policy. Therefore, in light of Shropshire's position of authority over Mays, the discriminatory statements are sufficiently related to the challenged decisional process to constitute direct evidence. Accordingly, viewing the evidence in the light most favorable to Mays, a reasonable fact finder could infer discriminatory animus on part of Shropshire and that it affected the decisional process.

Lastly, Defendants argue that the temporal remoteness of the statements by Shropshire necessitate a finding of stray remarks.[13] However, when direct evidence consists of explicitly racist statements made by a person involved in the decision-making process, the direct evidence may still be considered notwithstanding a substantial period of time between the remark and the challenged decisions. *See Chuang*, 225 F.3d at 1121-23, 1125-26, 1128 (holding that the statement, "two Chinks were more than enough," uttered by a doctor on the Executive Committee, was direct evidence of discriminatory intent despite the statement being uttered in 1989 and the adverse employment action occurring as late as 1996).[14]

---

[13] Defendants rely on *Price Waterhouse* for the proposition that the statements must be made relatively contemporaneously to support a finding of direct evidence and that the prohibited factor "must be a factor at the time the employment decision was made." *Price Waterhouse*, 490 U.S. at 241; *see also* (Def. Reply, at 43.); *but cf. Metoyer v. Chassman*, 504 F.3d 919, 937 (2007) (stating that "bigoted remarks by a member of senior management may tend to show discrimination, even if directed at someone other than the plaintiff" and that "remarks by . . . a decisionmaker tend to show bias, even if several years old"). However, liability limitations imposed by *Price Waterhouse* – that an employer could escape liability in a disparate treatment case by showing that the adverse decision would have been taken irrespective of an illegitimate reason, 490 U.S. at 241, – were amended by § 107 of Title VII in 1991, *Est. of Reynolds v. Martin*, 985 F.2d 470, 475 n.1 (9th Cir. 1993). Additionally, the 9th Circuit has held that this "mixed motives claim" is cognizable under § 1981 and a showing that an illegitimate factor played any role in the decisional process would preclude summary judgment. *Charter*, 915 F.3d at 626.

[14] Defendants distinguish *Chuang* by stating, "contrary to Plaintiff's description of Chuang, the Ninth Circuit's decision was not based solely on the discriminatory comments, but on the

For the stated reasons, Mays has presented direct evidence from which a reasonable factfinder could find that Shropshire had a discriminatory animus toward Mays because of his race and that Mays's race more likely than not motivated Shropshire in applying the Dispatch Policy to Mays. Whether Shropshire applied the policy in a non-discriminatory manner and whether Mays could have passed a background check when Shropshire had Mays listed as being unable to are both questions for the jury. The direct evidence in this record is sufficient to preclude summary judgment. *Charter*, 915 F.3d at 626; *see also Chuang,* 225 F.3d at 1127; *see also Dominguez-Curry*, 424 F.3d at 1041; *Mustafa*, 157 F.3d at 1180. Accordingly, Defendants' motion for summary judgment is denied with respect to Mays's discrimination claims.

II.     Retaliation Claims

Defendants also seek summary judgment on Mays' retaliation claims. Because the analysis under Title VII is applied to 42 U.S.C. § 1981 and ORS 659A.030 claims, Mays' retaliation claims will be analyzed together. *Campbell*, 783 F. Supp. 2d at 1147. The same *McDonnell-Douglas* burden shifting framework is applied to a claim of retaliation under 42 U.S.C. § 1981. *Schoen v. Freightliner LLC*, 311 F. App'x 50, 51 (9th Cir. 2009).

To make a *prima facia* case of retaliation, a plaintiff must prove "(1) [he] engaged in a protected activity; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the two." *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). It is undisputed that Mays engaged in protected activity by pursuing a discrimination claim

---

cumulative evidence, which included a plethora of concrete discriminatory acts against the plaintiffs." (Def. Reply, at 37.) Although the court looks to the cumulative direct and circumstantial evidence, the *Chuang* court held that the direct and circumstantial evidence were *independently sufficient* to preclude summary judgment. *Chuang,* 225 F.3d at 1127. Thus, bigoted statements analogous to those in *Chuang* can preclude summary judgment.

against Harder. (Def. Mot., at 35.) However, Defendants argue that Mays has failed to establish the second prong because he was never "skipped" for any dispatch, including to Harder, and thus Mays was never subject to an adverse employment action. (Def. Reply, at 46-47.) Moreover, Defendants argue that Mays has not proven the third prong for three reasons: (1) Shropshire did not recall when she learned of the suit against Harder, (2) the discriminatory remarks were too far removed from the alleged adverse actions, (3) and that Mays was never "skipped over" or denied a dispatch for which he was eligible. (Def. Reply, at 47-48).

An employment action must be materially adverse, which means it "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Although Plaintiff does not identify a dispatch that was explicitly denied, Plaintiff has identified dispatches where a jury could find that he was denied an opportunity to work with Harder. For example, Shropshire testified that, in response to the October 20 request, she incorrectly determined the region for Port Westward as Region Three. By incorrectly determining the work site as Region Three, the next available Region One apprentices, Turner and Garrett, were not dispatched for the October 20 request. Even though the October 22 request was changed from four to three apprentices, the next three apprentices dispatched would have been Brick, Ziesing, and Hooper, leaving Mays as the next available apprentice for the October 29 request. But, because Shropshire sent Region Three apprentices to the October 20 request, Mays was not at the top of the list for the October 29 dispatch request.

It is arguable that Shropshire did not know that the decisions surrounding the October 20 request would preclude Mays from being the next available apprentice for the October 29 request. But, a reasonable factfinder could conclude that Shropshire made dispatch decisions with the

retaliatory intent, discussed *infra*, to keep Mays lower on the Dispatch List than he should have

been. Moreover, the October 29 request specifically stated that a background check was required,

and Shropshire indicated "No Green Badge" next to Mays's name, despite Mays having obtained

a green badge at Intel through his most recent dispatch. A reasonable factfinder could conclude

that Shropshire listed Mays as not being able to pass a background check despite his recently

obtaining a "green badge" so that Mays could be passed on jobs requiring background checks.

Whether Shropshire knew that Mays was, in fact, eligible for a green badge is a question of fact

for the factfinder. Viewing the evidence in the light most favorable to Mays, a reasonable worker

would be dissuaded from making a claim of discrimination if they were effectively barred from

working with the largest Union employer in the area or positioned lower on the Dispatch List than

they should have been.

Unlike retaliation claims under Title VII and the ADEA, retaliation claims under § 1981

do not require but-for causation to be shown by a plaintiff. *Charter*, 915 F.3d at 626. Although

causation may be inferred from timing of the challenged actions and the protected activity, courts

in the Ninth Circuit have held that four months between the protected activity and the challenged

action is not sufficiently close in time to prove causation. *Villiarimo v. Aloha Island Air, Inc.*, 281

F.3d 1054, 1065 (9th Cir. 2002); *see also Garcia v. City of Everett*, 728 F. App'x 624, 628 (9th

Cir. 2018) (citation omitted) (stating that when a plaintiff relies on the timing of the action and

protected activity to imply causation, it must be "very close," and that four months is not

sufficiently close in time to prove causation). However, discriminatory statements that constitute

direct evidence can prove causation. *See Charter*, 915 F.3d at 626. Here, a reasonable factfinder

could find Shropshire's statements to be evidence of retaliatory intent. For example, Shropshire

stated that Mays working at Harder would "never happen" because of the all the "problems he's

caused." Shropshire could well be referring to the protected activity Mays pursued; thus, the statement is evidence of a retaliatory intent. Therefore, the direct evidence in the record presents a genuine issue of material fact as to whether Shropshire was motivated, in part, by Mays engaging in protected activity when she applied the Dispatch Policy to dispatches involving Mays.

Although the burden is shifted back onto Defendants to offer a non-discriminatory reason for the challenged action, to which Defendants argue that Mays was either not eligible for Harder positions or was already dispatched to another employer, Mays has necessarily created a triable issue by proffering direct evidence of retaliatory intent. *See Charter*, 915 F.3d at 626. Accordingly, for the reasons stated, Defendants' motion for summary judgment is denied with respect to Mays's retaliation claims.

### III.   Aiding and Abetting

Defendants seek summary judgment on Mays's claim of aiding and abetting under ORS 659A.030(g), which provides that it is an unlawful employment practice to "[f]or any person, whether an employer or an employee, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so." Mays's original allegation alleged that Shropshire worked in concert with Harder employees to discriminate and terminate Mays from Harder, which occurred on June 3, 2014. (Compl., ¶¶ 28, 60.) In addition to the claim being time barred under ORS 659A.885, Defendants argue that Mays has not offered facts to create a genuine dispute whether Shropshire worked in concert with Harder employees to discriminate and retaliatorily terminate Mays. (Def. Mot., at 37-38; Def. Reply, at 50.)

Plaintiff contends that there was a concerted effort between Shropshire and Harder employees, Lucas and Massey, against Mays. Couched as factual assertions, Plaintiff argues that Shropshire and Massey were "close friends," that Shropshire directed Macauley to give Massey negative information about Mays for purposes of Harder's suit with Mays, that Shropshire's

husband and Marboe were close friends, and that Shropshire worked with Lucas to keep Mays from working with Harder. (Meyer Decl., Ex. 4, 6, 8, 9; Pl. Resp., at 8 & fn. 1, 10, 12.) There is no evidentiary support for these assertions.

Plaintiff responds to Defendants' statute of limitations argument by asserting that the disputed dispatches in both October 2015 and March 2016 are within the one-year statute of limitations. (Pl. Resp., at 29.) Plaintiff offers as evidence to support their conspiracy argument: (1) one email from Lucas to Shropshire during October 2016 indicating that the number of requested apprentices on the October 22 request was changed from four to three apprentices and requesting the names of the apprentices; and (2) two emails from Lucas to Shropshire on March 15, 2016.

Regarding the October 2015 email, there is no evidence that suggests Lucas knew Mays's position on the list or whether Lucas and Shropshire spoke on the phone to coordinate this change in order to "skip" Mays. Regarding the March 2016 emails, in the first email, Lucas asks to speak to Shropshire prior to dispatching apprentices.[15] In the second email, Lucas informs Shropshire that Harder will not be taking on apprentices the following week. Plaintiff argues that this break in dispatch requests was coordinated by Shropshire and Lucas. But, as Defendants correctly point out, the assertion that there was a concerted effort on part of Shropshire and Lucas is conclusory. The evidence is insufficient to allow a reasonable inference that Shropshire and Lucas worked in concert to bar Mays from working at Harder.

/ / / / / /

/ / / / / /

---

[15] Plaintiff asserts that Shropshire asked to speak with Lucas, despite the email excerpt showing the contrary. (Pl. Resp., at 14.)

Plaintiffs have not offered evidence to create a genuine dispute of material fact whether Shropshire aided and abetted Harder's alleged unlawful treatment of Mays. Accordingly, Defendants' motion is granted with respect to the aiding and abetting claim.

## IV.    Intentional Interference with Economic Relations ("IIER")

Lastly, Defendants seek summary judgment on Plaintiff's claim of Intentional Interference with Economic Relations ("IIER"). An IIER claim requires that "a plaintiff [] allege each of the following elements: (1) the existence of a professional or business relationship (which could include, [] a contract or a prospective economic advantage); (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relationship; and (6) damages. *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995). Defendants do not dispute whether the first element has been met. (Def. Mot., at 39.) However, the parties dispute whether Defendants are third-parties for purposes of IIER.

A claim of IIER "serves as a means of protecting contracting parties against interference in their contracts from *outside* parties." *McGanty*, 321 Or. at 536 (emphasis in original). A defendant is not a third-party when plaintiff and defendant's economic relationship is inextricably linked to the relationship between plaintiff and the other contracting party. *See Wieber v. FedEx Ground Package Sys., Inc.*, 231 Or. App. 469, 480 (2009). If a plaintiff has "continuing relations" with the contracting party outside of the relationship with defendant, a defendant may be a third-party. *See id.* Mays argues that he has "continuing relations with Harder that survive past his apprenticeship and continue through his time as a Journeyman when he is no longer being dispatched by the Training Center." (Pl. Resp., at 30.) However, even if Mays has continuing relations with Harder such that the Training Center would be considered a third-party, Mays does not offer any evidence that the Training Center interfered with his economic relationship with

Harder after his graduation from the program in 2017. Thus, Mays has not established a genuine dispute as to whether the Training Center was a third-party.

When the claim of IIER is against an employee, "the [third-party] prong is met only if the factfinder determines that the employee was acting outside the scope of his or her employment." *Butler v. State, Dep't of Corr.*, 138 Or. App. 190, 197 (1995) (internal quotations omitted). An employee acts outside the scope of their employment when the "alleged conduct occurred outside the space and time limits authorized by the employer, [] the employee was not at all motivated by a purpose to serve the employer, and [] the alleged conduct was not of a type that the employee was hired to perform. *Id.; see also Mannex Corp. v. Bruns,* 250 Or. App. 50, 54 (2012). Plaintiff argues that evidence of discriminatory intent or a retaliatory motive is sufficient to create a genuine dispute as to whether Shropshire is a third-party. (Pl. Resp., at 31.); *see also RMS Tech., Inc. v. Stenbock,* 113 Or. App. 344, 346-47 (1992) (holding that summary judgment was not appropriate because the evidence "permitted an inference that [defendant's] motives were not to benefit the corporation's interests, but were instead self-serving or vindictive"). The court disagrees.

An employee acting with mixed-motives is insufficient evidence to support a finding that the employee was a third-party, even if some of the employee's motives are unlawful in nature. *See Sims v. Software Sols. Unlimited, Inc.*, 148 Or. App. 358, 364, 365 & n.3 (1997) (citing case law holding that, as a matter of law, evidence of plaintiff's mixed-motives could not allow a reasonable factfinder to infer that plaintiff was acting "solely in pursuit of an interest unrelated" to employer's business, which is required to find employee was a third-party). Rather, there must be evidence in the record from which a reasonable factfinder could infer that the employee acted solely for their own interest. *Id.* Even if the actions by the employee are taken at least in part to

further the interests of the employer, the employee cannot be considered a third-party as a matter of law. *See id.* at 365.

At most, Mays has offered evidence that Shropshire acted with mixed motives. Mays has not offered evidence that would allow a reasonable factfinder to infer that Shropshire acted solely for her own interests. Thus, Shropshire cannot be considered a third-party as a matter of law. Mays has failed to create a genuine dispute as to whether the Training Center or Shropshire are third-parties for purposes of his IIER claim. Accordingly, Defendants' motion for summary judgment is granted with respect to Mays's IIER claim.

*Conclusion*

For the reasons stated, Defendants Motion for Summary Judgment (ECF No. 89) is GRANTED and DENIED as follows: as to Mays's aiding and abetting and IIER claims, Defendants' motion is GRANTED; as to Mays's discrimination and retaliation claims, Defendants' motion is DENIED.

IT IS SO ORDERED.

DATED this ____4th____ day of September, 2019.

JOHN V. ACOSTA
United States Magistrate Judge